Argued March 9, reversed in part June 20, petition for rehearing
denied July 24, 1962

# CHRISTENSON *v.* BEHRENS ET UX,
# GENERAL SHEET METAL WORKS

### 372 P. 2d 494

*Harlow F. Lenon,* Portland, argued the cause for appellants. On the brief were Lenon & Willner, Portland.

*Joseph P. Stirling,* Portland, argued the cause and submitted the brief for respondent Christenson.

*Donald Paul Hodel,* Portland, argued the cause for respondent General Sheet Metal Works, Inc. On the brief were Hart, Rockwood, Davies, Biggs & Strayer and Michael Pertschuk, Portland.

Before McAllister, Chief Justice, and Rossman, Perry and Goodwin, Justices.

ROSSMAN, J.

This is an appeal by Walter R. and Alice M. Behrens, two of the defendants, from a decree of the circuit court which sustained three lien claims against real property owned by those two defendants. One of the lien claims was alleged by the plaintiff who is in the electrical wiring business; another by the defendant, General Sheet Metal Works, Inc.; and the third by the defendant G. W. Paulson Co., a floor covering organization. The property is improved with

a structure occupied by a mercantile establishment known as Walt's Super Market which the Behrens operate. In 1959 the Behrens entered into a contract with a corporate contractor, Fred W. Carter Co., for extensive alterations to the building. The Fred W. Carter Co., to which we will refer as the Carter Company, contracted with the plaintiff Christenson, who does business under the name of Christenson Electric Co., for the performance of the electrical work involved in the project; with the General Sheet Metal Works, Inc., for the sheet metal work; and with the defendant G. W. Paulson Co. for the covering of parts of the floor with asphaltic tile.

The subcontractors performed their undertakings fully, and the Behrens paid the Carter Company the entire contract sum. However, that company failed to pay the subcontractors, and about that time filed a petition in bankruptcy. In the meantime the three subcontractors filed their lien notices.

Thus, this is a case in which owners who paid their contractor in full for all work done upon their property are faced with lien claims based upon ORS 87.005—87.075 (mechanics' and materialmen's lien statutes) which seek to compel them to pay again for the work—this time to the subcontractors through the imposition of liens. We are aware of nothing in the form of equities which exerts a gravitational pull toward the position of any party and are satisfied that the issues must be resolved according to the bleak letter of the statute just cited.

When the plaintiff-respondent Christenson filed his suit to establish and foreclose his lien he made as defendants the Behrens and the other two subcontractors whom we have named. Each of those two

subcontractors, by way of cross complaint, alleged its lien claim and prayed for foreclosure. The answer of the Behrens denied the validity of each of the liens. The circuit court sustained the validity of all the liens and decreed their foreclosure.

The appellants-defendants Behrens contend that the three claims were not timely filed and that the lien claim of plaintiff Christenson lumps into one unsegregated total the sums he charged for work performed upon personal as well as upon real property.

Each of the three lien claimants sent to the Carter Company in December 1959, or earlier, a statement of account as a final bill for completed performance of the subcontractor's work. If performance of the contract had been completed when the "final bill" was mailed, the lien notices that were later filed were too late. However, a workman in the employ of Christenson returned to the building January 8, 1960, and performed work which, upon a portal-to-portal basis, consumed four hours. Christenson filed his lien claim February 8, 1960. Paulson sent a workman to the structure January 6, 1960, who spent there six hours in replacing some broken tiles and installing adjacent to the floor 84 feet of a rubber-like material which served the purpose of a base board or mop board. The Paulson Company filed its lien claim February 3, 1960. General Sheet Metal Works performed some work upon the building January 6 and filed its lien claim February 2, 1960.

ORS 87.035 says:

"Every original contractor, within 60 days after the completion of his contract, and every mechanic, artisan * * * or other person, except the original contractor, claiming the benefit of

ORS 87.005 to 87.075, within 30 days after the completion of the construction, or after he had ceased to labor thereon from any cause, or after he has ceased to furnish materials therefor, shall file for recording with the recording officer of the county in which the improvement, or some part thereof, is situated, a claim * * *."

ORS 87.045 states:

"(1) As an alternative method for determining the completion date of an improvement, the improvement shall be conclusively deemed completed as to all labor performed and materials used prior to the date of the notice described in this section, when the improvement has been substantially completed, or when it has been abandoned. * * *"

If the work performed by the three lien claimants in January was done "after the completion of the construction," as that term is used in ORS 87.035, the lien claims cannot be sustained. The owners (Behrens) claim that the work performed by each claimant in January was done "after the completion of the construction," that it was trifling in character, and was an after thought which was resorted to for the purpose of extending the period for filing a lien.

According to the plaintiff's brief he bound himself to perform the following work:

"* * * to do all the necessary electrical work in the store, rewiring where necessary, and installing panel boxes and connecting current to all items requiring electrical current. The contract states 'Complete *hookup* of the refrigeration units and cases and owner's light fixtures.' The Christenson Co. did not, and was not to provide any fixtures. These were provided by the owner."

Eleanor Armstrong, the bookkeeper and office manager for Christenson, testified that on December

she mailed to the Carter Company a statement of account having this entry: "Balance of the contract on Walt's Super Market $500.00." Although that appeared to be a final billing, Mrs. Armstrong explained, "I have billed contracts when they have to be completed," and testified that since payment was not expected until in February she felt justified in sending the statement in December even though all the work had not been totally performed. According to her, "there was not enough to bill on it to be of any significance." Before she sent the bill, the workman who had been doing the work upon the job told her "a little bit of work was left to be done on the contract."

Leighton Lewis, a witness for the plaintiff Christenson, was the journeyman electrician in his employ who did much of the work upon the Behrens' building. Before completing the work he became ill and was confined to his home from sometime in November until "a little after Christmas," so he testified. Upon the orders of his superior he returned to the building January 8 and performed the work which we have mentioned. According to him,

"I believe Walt wanted the unit heaters hooked up, and I went out to do that."

That was the occasion for his return to the structure January 8. He added:

"* * * I am sure there were some fixtures on the bread display racks that had to be completed. And then they had moved some equipment, just moved it around a little, in the meat department. And a piece of flex that was on the saw wasn't long enough, or removed from the reflector, and I replaced it with a longer piece of flex."

Lewis, as we have seen, went to the structure to hook up some unit heaters. He discovered, however, that

it was impossible to hook them up and explained the inability in this way:

> "\* \* \* The carpenters did not cut a scheduled hole to the attic, so the wiring was not accessible, and under the Electrical Code all wiring has to be accessible. So Walt said he would call the carpenter, and when they cut the hole he would call me back and I would finish the job."

Lewis was never called back and never hooked up the unit heaters. Thus, the work which called him to the building January 8 was never performed. Lewis testified that there was "a block or pipe column, that had not been stressed properly." When he undertook to remedy it he found that he did not have "the right tap or die to do" the work with and was compelled to abandon it. It will be recalled that he found that one of the items of mechanical equipment in the store needed a longer piece of flex. Flex, if we correctly understand its nature, is wiring of a spiral type in the form of a cable that may be used in places such as the store in question. All that Lewis did concerning this item was to "replace it with a longer piece of flex," so he testified. It would seem that that bit of service upon his part was a repair item or possibly an act of courtesy. While in the store he noticed "there were some fixtures on the bread display racks that had to be completed." He attended to those details. It is plain from his testimony that "the bread display racks" were movable trade fixtures and were not a part of the real property itself. They were not fastened to the structure by nails or screws. They merely rested on the floor, although an electrical wire ran from their base to a socket or other device which supplied the bread rack with electrical current for illumination purposes. The record warrants a belief

that the bread racks were made foot-loose so that they could be easily shifted around, when necessary, into other locations.

Lewis testified that he placed "covers on the panels." His explanation indicates that the covers or panels were "galvanized metal plates" of different sizes which he screwed into place. He did not mention the number of the covers which he placed, nor the amount of the time consumed in this work. We infer that this work was rather trivial. If it was other than that, the plaintiff should not have depended upon the scant testimony which vaguely indicates its nature.

The foregoing appears to be all that Lewis did on January 8: (1) he replaced a piece of flex that was too short with one that was longer; (2) he screwed into place some metal plates; and (3) he performed some work upon an island which displayed bread but which was a trade fixture and not a part of the real property.

The lien claimant, General Sheet Metal Works, was required by its contract to construct among other items two toilet room vents equipped with grilles, and install in each of them exhaust fans. It was also required to fabricate and install about nine feet of duct topped by a conical cap which a witness termed a "china cap." Howard Pinkstaff, one of the officers of that concern, testified that his company had completed virtually all of the roughing in of its work by November of 1959, but could do nothing further until the ceilings of the toilet rooms had been plastered and painted. In that manner operations remained at a standstill until January 6. Mr. Pinkstaff, referring to a period a week or so prior to January 6, testified:

"* * * I was beginning to wonder why there

was such a delay in the work, and so I don't remember whether I was out in that neighborhood or whether I made a special trip out there, but anyway, I went by Walt's Super Market, and noted more work to be done in the toilet room. I stopped in to check on it, to see if it was possibly ready.

"In my observation, I could tell that they were ready, and the work could be performed. I don't know whether this was a day or two days before we sent a man out there that I realized it could be finished.

"So in order to clear it up, I checked on the amount of material and what not that had to be done in lining up a man for the last couple days, which turned out to be January 6th, and we had him go out and finish the work—"

In that manner the exhaust fans were installed, the grilles were put in place, the duct was constructed, and the conical cap was set. We do not believe that that service which included the furnishing of two exhaust fans can be deemed trivial. A day or two later the foreman for the Carter Company telephoned to the sheet metal company and, after stating that the structure was ready for the metal company's final work requested its completion. He was told that two days previously the work had been completed. No one questioned Mr. Pinkstaff's explanation of the occasion for sending a man to the premises January 6, and we know of no reason for doubting his truthfulness.

■ The Paulson Company sent to the defendants' structure on January 6 a floor layer who worked there about six hours. Upon that occasion he installed some material which is called rubber base and replaced some broken tiles. We know of no reason for believing that the replacement of the broken tiles was anything other

than repair work. The testimony of an officer of the Paulson Company creates the impression that the installation of the rubber base was not required by the Paulson Company's contract or that in any event it was performed under conditions other than those contemplated by its contract. The Paulson Company has not appeared in this court, and we have no explanation for that situation. We believe that the work performed by it on January 6 cannot be deemed construction work.

■ It is well settled by several decisions of this court that the efforts of a contractor or of a subcontractor who returns to the building where work has stopped after apparent completion and all tools have been taken away and then performs some trifling work or a few odds and ends will not be deemed original construction so as to extend the period of limitation for filing mechanics' liens. This is especially true in situations such as the one at bar in which the interests of an innocent owner may be affected by the purported lien. See *Stark-Davis Co. v. Wilson,* 119 Or 308, 248 P 1095; *Fox & Co. v. Roman Catholic Bishop,* 107 Or 557, 215 P 178; *Sarchet v. Legg,* 60 Or 213, 118 P 203; and *Crane Co. v. Ellis,* 58 Or 299, 114 P 475.

We now return to the claim of Christenson, the plaintiff. The only service which Lewis rendered on January 8 that was not performed upon a trade fixture was his work in putting in place the covers or panels. In view of the fact that he did not mention the number of covers which he fastened in place nor the time that was consumed in that part of his work, we feel that it was of little consequence. The work which he performed upon the bread racks was done upon personal property, *Barber, Trustee v. Henry et al,* 197 Or 172, 252 P2d 802. At some previous time

he may have installed in the floor of the building or in its walls some wiring that became a part of the structure, but on January 8 he did nothing of that kind. His work was confined to the bread racks themselves.

■ The plaintiff performed no service on January 8 which can be deemed construction work. His lien claim was filed too late.

■ We believe that the lien claim of the defendant General Sheet Metal Works, Inc., was timely filed.

The decree of the circuit court is vacated. It is directed to enter a new decree which will sustain the lien of the General Sheet Metal Company only. Costs and disbursements will be allowed to no party except to General Sheet Metal Works, Inc.